UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CASE NO. 1:16-CR-161 |
| : | |
| TIMOTHY ANDREW YOUNG, : | (Judge Caldwell) |
| Defendant : | |

*M E M O R A N D U M*

*I.     Introduction*

Defendant Timothy Andrew Young has moved to suppress evidence obtained from a warrantless search of his residence.  After careful consideration, the court will deny Defendant's motion.

*II.    Background*

On June 22, 2016, Defendant was indicted on one count of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1).  (Doc. 3).  He initially represented himself, but after multiple disruptive hearings and refusals to cooperate, this court found that he had waived his right to self-representation.  (See Doc. 56 at 9).  Standby counsel from the Federal Public Defender's Office was appointed to represent him.  (Id.; Doc. 57).

After standby counsel was appointed, Defendant—through his attorney— sought leave to file a motion to suppress evidence nunc pro tunc, (Doc. 69); the Government did not oppose the late filing of a motion to suppress, (id. at 3).  In his motion to suppress, Defendant claims that the warrantless search of, and seizure of evidence from, his residence violated his Fourth Amendment rights.  (Doc. 70; Doc. 71 at 5).  The

Government asserts that valid exceptions to the warrant requirement made the search and seizures constitutional. (Doc. 78 at 6-11). An evidentiary hearing was held on September 26, 2017. (Doc. 77 at 1). The motion to suppress is now ripe for disposition.

III.        *Findings of Fact*[1]

On April 6, 2016, four officers from the Franklin County Sheriff's Office attempted to execute an arrest warrant for Defendant at his residence. (Doc. 77, Tr. of Hr'g on Mot. to Suppress [hereinafter "Doc. 77"], at 5-6). Defendant lived at this residence with Teresa Wines-McLean ("Wines-McLean"). (Doc. 77 at 72).

When the officers arrived, they positioned themselves around the house. (Id. at 8-9). Several officers knocked on the rear sliding glass door, and Wines-McLean opened the door to speak with the officers. (Id. at 8). She told them that Defendant was home and that she would go get him. (Id.) Shortly thereafter, Wines-McLean shut and locked the sliding glass door. (Id. at 8, 28).

Sergeant Benjamin Sites ("Sergeant Sites") observed, through the front bay window, a male in a reclining chair in the living room area. (Id. at 8, 22). Around the time the rear sliding glass door was shut and locked on the officers, one of the deputies at the front of the house saw the man get out of the recliner and move to the back of the house where the bedrooms were located. (Id. at 9).

In response to the rear door being shut and locked, the officers knocked loudly and warned the occupants that if the door was not opened, the officers would force entry into the house. (Id.) After approximately four to five minutes, Wines-McLean opened the door. (Id.) At that time the officers entered the residence and physically

---

[1] Unless otherwise noted, the following factual account represents the facts the court credits upon consideration of the testimony and evidence presented during the evidentiary hearing on September 26, 2017.

2

removed Wines-McLean to the rear porch. (Id. at 10, 30). She seemed distraught and frightened, and told the officers that Defendant had concealed himself somewhere in the house. (Id. at 10-11).

The officers asked Wines-McLean if there were firearms in the home, and she responded affirmatively. (Id. at 74). According to Sergeant Sites, she also made statements indicating that Defendant was not going to surrender to law enforcement easily, that there were loaded weapons in the house, and that Defendant was prepared to use them if necessary. (Id. at 11). Wines-McLean testified that she did not recall making such statements. (Id. at 75).

Upon moving Wines-McLean outside, the officers began to take custody of the house. (Id. at 10-11). After clearing the kitchen area where they had entered, and repeatedly identifying themselves and calling out for Defendant to give himself up, they decided to call for backup before proceeding further. (Id. at 11-12). While holding the hallway and awaiting backup, Sergeant Sites heard a "crashing noise" from somewhere in the house. (Id. at 12, 33). When he exited the house sometime later, he saw a basement window that was ajar. (Id. at 34).

During much of this time, Wines-McLean was on the phone with her next-door neighbor, Gina Spero ("Spero"), and eventually went to Spero's property for consolation. (Id. at 63-64, 78). While Wines-McLean was literally crying on Spero's shoulder, Spero saw Defendant jump her fence and run through her backyard. (Id. at 13, 64, 68). This information was immediately relayed to the officers. (Id. at 13, 68). Spero was not allowed to return to her home since Defendant was on the loose and had been seen near her house, so the officers requested that she and Wines-McLean return to

Wines-McLean's residence and wait in the kitchen/dining area. (Id. at 65, 68). While they waited at the kitchen table, they provided written statements to the officers and answered questions about Defendant. (Id. at 65-66).

After backup had arrived, but before Spero and Wines-McLean had returned, several officers searched the Wines-McLean residence for Defendant. (Id. at 14, 38, 51). Pennsylvania State Police Trooper Robert Wareham, Jr. ("Trooper Wareham") testified that because Defendant's whereabouts were unknown, a perimeter was established to make sure that no one entered or left the area where they were searching. (Id. at 50-51). The officers searched the basement, bedrooms, closets, etc. for Defendant. (Id. at 14, 51-52). During this search, the officers discovered numerous firearms in plain view, some of which were loaded. (Id. at 14, 15, 53, 54). Several of the rifles were leaning up against the walls and windows, appearing to be "staged." (Id. at 18, 60).

Trooper Wareham testified that after "other officers" had determined that Defendant was a felon not to possess firearms, Trooper Wareham returned to the residence and collected the firearms "at the direction of [his] supervisor at the time." (Id. at 54, 55, 60-61). Sergeant Sites also personally seized two rifles from the residence, and then assumed custody of all twenty-five of the confiscated firearms after creating an inventory log. (Id. at 16, 39-40; Government's Ex. 1). Sergeant Sites testified that the firearms were collected and removed from the home because Defendant was a fugitive, his whereabouts were unknown, and they "didn't want him to come back to the house and have access to the[] guns." (Doc. 77 at 16-17). Sergeant Sites also explained that after confiscating and inventorying the firearms, he called the local assistant district attorney

and was informed that Defendant may be a person not to possess firearms under federal law. (Id. at 17-18).

Both Sergeant Sites and Trooper Wareham testified that Wines-McLean had given verbal consent to search the residence. (Id. at 18, 42-43, 53). Sergeant Sites also recalled that he specifically requested and received permission from Wines-McLean to search the house for "any other weapons." (Id. at 18, 43). Spero likewise testified that Wines-McLean had consented to a search of the residence for weapons upon Sergeant Sites' request. (Id. at 65-66, 68-70). Wines-McLean testified that she did not recall giving consent to search, but also noted several times that she "was a mess that morning." (Id. at 75, 82). Wanting the officers to know that Defendant was unarmed, she also informed them that he had left his handgun in its normal place—underneath his pillow in the bedroom—and showed the handgun to the officers. (Id. at 14, 81). Wines-McLean also told the officers that she did not want the guns that had been collected to be returned. (Id. at 17, 42, 47-48, 76).

Defendant was apprehended later that day several miles from his residence. (Id. at 44). The guns had been seized and removed from the house prior to Defendant's capture. (Id.)

IV.     *Discussion*

Neither party contends that the law enforcement officers were unlawfully in the residence or unlawfully searching for Defendant. The officers had a valid warrant for Defendant's arrest and reasonably believed that he was inside his residence at the time they attempted to take him into custody. See United States v. Veal, 453 F.3d 164, 167 (3d Cir. 2006) (citing Payton v. New York, 445 U.S. 573, 603 (1980)). Rather, the thrust of

5

Defendant's argument is that the officers impermissibly expanded the scope of their search by looking for and seizing firearms after they had swept the house and determined that Defendant was not there. (See Doc. 81 at 1-2).

The Government contends that two exceptions to the warrant requirement permitted the officers to search for and seize the firearms: (1) exigent circumstances, and (2) consent by Wines-McLean. The court will address each argument in turn.

### A. Exigent Circumstances

The Government first argues that exigent circumstances existed due to Defendant's flight from the officers and his unknown whereabouts. These circumstances, the Government maintains, allowed the officers to search for and confiscate the firearms without a warrant in order to ensure officer safety. For the following reasons, this argument falls short.

The Fourth Amendment establishes that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. Not all searches and seizures require the issuance of a warrant. Rather, the Fourth Amendment merely proscribes those searches or seizures by the state—with or without a warrant—that are unreasonable. Florida v. Jimeno, 500 U.S. 248, 250 (1991).

"Warrantless searches and seizures inside someone's home . . . are presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion." United States v. Coles, 437 F.3d 361, 365 (3d Cir. 2006) (citing Steagald v. United States, 451 U.S. 204, 211 (1981)). Determining

whether exigent circumstances were present involves an objective factual analysis unconcerned with the subjective intent of law enforcement. United States v. Mallory, 765 F.3d 373, 383 (3d Cir. 2014). The Government bears the "heavy" burden of establishing that exigent circumstances justified the need for a warrantless search or seizure in a home. Id. at 383-84 (quoting Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984)).

Well-established examples of exigent circumstances include hot pursuit of a suspected felon, the possibility of the imminent destruction of evidence, and imminent danger to the lives of law enforcement or others. Mallory, 765 F.3d at 384; Coles, 437 F.3d at 366. "The common thread is imminence—the existence of a true emergency." Mallory, 765 F.3d at 384 (citation and internal quotation marks omitted). Furthermore, exigent circumstances can dissipate, thereby no longer providing a basis for a warrantless search or seizure. See id.; Mincey v. Arizona, 437 U.S. 385, 393 (1978).

Here, the Government plainly had the right to enter Defendant's home and search for him, as they had a warrant for his arrest and reasonably believed he was at his home and had concealed himself inside. See Veal, 453 F.3d at 167. But it is also clear that after backup had arrived and the house had been thoroughly swept and secured, a different warrantless search of the home was conducted. That search was for firearms. (See Doc. 77 at 40-41 (Sergeant Sites admitting that "at that point in time I was not looking for [Defendant] underneath the bed. I believe two troopers had already cleared that master bedroom and said that he wasn't in here. . . . I was kind of doing a cursory, secondary search, I guess you could say")).

In order for such a warrantless "secondary search" of the home to be permissible, however, law enforcement would need both probable cause and exigent circumstances. The Government struggles to show either here.

First, whether the officers knew—at the time of the search for and seizure of the weapons—that Defendant was a felon not to possess firearms is unclear at best. In fact, Sergeant Sites credibly testified that it was only after the firearms were collected and inventoried that he learned that Defendant was possibly prohibited from possessing firearms under federal law. It is also not clear whether Defendant's flight from the scene would provide the necessary probable cause to support a warrantless search for firearms.

Regardless, even if the officers had the requisite probable cause, at the time they performed the secondary search for weapons, any exigent circumstances—in particular an imminent danger to the officers or bystanders—had dissipated. Many facts support this conclusion, including that an eyewitness (Spero) had told the officers that she saw Defendant flee the scene, multiple officers were present at the residence and had created a perimeter but found no sign of Defendant in the immediate area, a thorough sweep of the entire house had failed to turn up Defendant, and the officers had secured the residence. The dissipation of the exigency is perhaps best demonstrated by the fact that the officers themselves requested that Wines-McLean and Spero return to the residence, and had them seated in the kitchen drafting statements and answering questions about Defendant.

These facts do not demonstrate an "imminent" threat or need to search for and seize firearms without a search warrant. It is true that Defendant had not yet been apprehended and his whereabouts were unknown. However, a simple police perimeter of

8

the house—like the one that had been established here—would have sufficed to keep Defendant from returning and arming himself and putting someone in danger, which was Sergeant Sites' proffered reason to search for and confiscate the twenty-five guns without a warrant.

Finally, the cases that the Government relies on for its exigent-circumstances argument are easily distinguishable from the instant matter. In United States v. Allen, 618 F.3d 404 (3d Cir. 2010), the officers had a valid search warrant (rather than just an arrest warrant), and briefly detained the defendant while they searched a public bar (rather than a private home) located in a high-crime area in order to ensure the officers' safety during the search. Likewise, in Los Angeles County v. Rettele, 550 U.S. 609 (2007), the officers had a valid search warrant, and were found to have been justified in ordering naked residents out of their bed at gunpoint for several minutes to secure the area and ensure officer safety during the search. Neither of these cases is similar to the instant facts or issues.

Accordingly, the Government has failed to carry its burden to show that exigent circumstances excused the warrantless search for and seizure of the firearms. Nonetheless, the Government also contends that the search and seizures were justified by express consent from a cohabitant. This argument is more persuasive.

B. Consent from Wines-McLean

"Consent is an exception to the requirements of both a warrant and probable cause." United States v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011) (citation and internal quotation marks omitted). Moreover, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person

9

with whom that authority is shared." Id. (quoting United States v. Matlock, 415 U.S. 164, 170 (1974)). The authority implicated here is not based on property rights, but instead "on mutual use of the property by persons generally having joint access [to] or control" of the premises or effects sought to be inspected or seized. Id. at 230-31 (quoting Matlock, 415 U.S. at 171 n.7).

For an absent person to retain a privacy interest in premises or possessions such that a cohabitant or other third party with access or control cannot provide consent to search or seize, the absentee must take some action to establish that he has not "relinquished his privacy" in the area or item. See United States v. King, 604 F.3d 125, 137 & n.6 (3d Cir. 2010) ("To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his *own* consent, he is free to place these items in an area over which others do *not* share access and control, be it a private room or a locked suitcase under a bed." (quoting Georgia v. Randolph, 547 U.S. 103, 135 (2006) (Roberts, C.J., dissenting))); Stabile, 633 F.3d at 231. If the absentee fails to take such action, he relinquishes his reasonable expectation of privacy with respect to the third party and "assumes the risk" that the third party will consent to a search or seizure. See, e.g., King, 604 F.3d at 137.

In this case, the facts related to this issue are clear. First, while Wines-McLean's testimony is equivocal about what permission she gave to Sergeant Sites, everyone else who was present at the residence and testified at the evidentiary hearing clearly remembered her giving verbal consent to the officers to search the residence. In particular, both Sergeant Sites and Spero specifically recalled that Wines-McLean gave verbal consent to search the house for weapons. Moreover, Wines-McLean made clear

that she did not want the firearms returned after they had been collected. There does not appear to be any indication that Wines-McLean's consent for the search or seizures was involuntary.

Second, while searching for Defendant, the officers discovered dozens of firearms in various rooms of the house propped up against windows, underneath the bed, and generally in plain view without any sort of case or covering. None of these circumstances indicates that Wines-McLean did not have access to or control of the firearms, or that Defendant had attempted to retain a privacy interest in the guns to the exclusion of Wines-McLean. Rather, under these circumstances, Defendant assumed the risk that Wines-McLean would consent to a search of the house and seizure of the firearms. Because Wines-McLean did just that, Defendant's Fourth Amendment rights were not violated by the search or seizure and his motion to suppress must be denied.

*V.	Conclusion*

The warrantless search for and seizure of the firearms in this case was not excused by exigent circumstances. Nevertheless, the search and seizures were lawful because Teresa Wines-McLean validly and expressly consented to both. Accordingly, Defendant's motion to suppress will be denied. An appropriate order will follow.

    /s/ William W. Caldwell
William W. Caldwell
United States District Judge